IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                                  :
UNITED STATES OF AMERICA,         :          Criminal Action
                                  :
                 Plaintiff,       :          No.  2:14-cr-00109
                                  :
v.                                :
                                  :          Date:  July 9, 2014
GARY L. ROEHER,                   :
                                  :
                 Defendant.       :
_____x


TRANSCRIPT OF PLEA HEARING HELD
BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:        AUSA MEREDITH GEORGE THOMAS
                           U.S. Attorney's Office
                           P.O. Box 1713
                           Charleston, WV  25326-1713


For the Defendant:         J. TIMOTHY DIPIERO, ESQ.
                           DiTrapano Barrett & Dipiero
                           604 Virginia Street East
                           Charleston, WV 25301


Probation Officer:         Joshua Smith-Shimer


Court Reporter:            Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1      PROCEEDINGS had before The Honorable Thomas E. Johnston,

2    Judge, United States District Court, Southern District of West

3    Virginia, in Charleston, West Virginia, on July 9, 2014, at 9:16

4    a.m., as follows:

5          COURTROOM DEPUTY CLERK:  The matter before the Court is

6    the United States of America versus Gary L. Roeher, scheduled for

7    a plea hearing.

8          THE COURT:  Good morning.  Will counsel please note

9    their appearances?

10         MS. THOMAS:  Meredith George Thomas on behalf of the

11   United States.

12         MR. DIPIERO:  Tim DePiero on behalf of Mr. Gary Roeher,

13   who is also present, Your Honor.

14         THE COURT:  Good morning.  Mr. Roeher, will you please

15   stand, and I will ask the deputy clerk to administer an oath to

16   you at this time.

17         COURTROOM DEPUTY CLERK:  Please raise your right hand.

18             **GARY L. ROEHER, DEFENDANT, SWORN**

19         THE COURT:  You may be seated.

20    Mr. Roeher, do you understand that you are now under oath

21  and you must tell truth and, if you testify falsely, you may face

22  prosecution for perjury or for making a false statement?

23         THE DEFENDANT:  I do, yes, sir.

24         THE COURT:  All right.  Throughout the course of this

25  hearing, I'm going to be asking you a number of questions and I

want to make sure that you and I are communicating clearly. So, if at any time I ask a question that you don't understand, or anything else occurs in this hearing you don't understand, I want you to feel free to speak up and seek clarification.

Also, if at any time you need to confer with your attorney, I'll be pleased to pause the proceedings to allow you to do so. Do you understand all that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Before we get into the hearing itself, my understanding, Mr. DiPiero, is that of these ten cases that I'm going to be taking pleas on over the next few weeks, that you represent four of the defendants, and I think I need to explore that a little bit.

I don't -- obviously, there's some relationship among these cases and I don't -- at this point, I don't know much about those relationships but, obviously, that presents at least a potential, a theoretical potential, for conflict of interest.

I need to tell you that, although this isn't the legal standard, obviously, I've only had to deal with this issue once before so far in my career on the bench. A lawyer represented two -- they were either brothers or cousins. There were waivers. The lawyer assured me there would be no problem. The AUSA assured me there would be no problem. In the end, there was a problem.

So, the problem from my perspective right now, is how I size

that up.  I think that the lawyers are taking a risk sizing that

up, up front, because you just never know what's going to happen,

but I have a -- I have a brief colloquy that I think -- I think

that I'd like to go through.

I'm not so sure that Rule 44(c) technically applies because

none of these -- these defendants are all charged in separate

cases.  Nonetheless, the -- and I'll just -- I'll just start with

it this way.

Mr. Roeher, you have a right to effective assistance of

counsel and I say that in no -- by no means implying that Mr.

DiPiero is anything other than effective.  He is a very

experienced and a very good criminal defense attorney, but that

the right to effective assistance of counsel also includes the

right to separate legal representation and representation that

does not involve a conflict of interest, or the potential for a

conflict of interest, and I'm aware that Mr. DiPiero, as I

indicated earlier, represents three other defendants in these --

this related set of cases.

So, Mr. DiPiero, at this time, I'm going to ask you to place

on the record the -- I want you to tell me the facts and

circumstances that -- and I understand that you have a waiver.

MR. DIPIERO:  Yes, sir.

THE COURT:  Which I would like to see, at some point,

but I'd like for you to explain to me the facts and circumstances

surrounding your representation of these four defendants and why

you believe that there's not a conflict of interest, or a potential conflict of interest, is unlikely.

And, Mr. Roeher, I want you to listen to this discussion very carefully.

MR. DIPIERO:  Your Honor, this is a highly unusual situation for me, as well.  I have -- I've represented a couple of people in the past and oftentimes it's been family related, so it's been an easy waiver.

I guess just to -- just how this whole thing started was --

THE COURT:  Before you go further, I meant to ask you, Mr. DiPiero, is there any reason you think we ought to have this discussion in-camera?

MR. DIPIERO:  Not really, no, sir.  I don't think so.

THE COURT:  All right.

MR. DIPIERO:  I don't think so.  Our firm, one of our partners was actually representing Mr. Alvis Porter a couple of years ago in a civil matter.  During that time, Mr. Porter was in a terrible accident where a guy was going the wrong way on the corridor between Logan and Williamson and Mr. Porter was going around a car and hit head-on.  It killed a guy instantly, it was a terrible thing, and I ended up representing Mr. Porter because he was already in our office on the other matter.

And, during the time that I was representing him on this, he mentioned that his -- excuse me -- some records had been subpoenaed to the federal grand jury and could I represent him on

1    this and I said, sure, and I actually made inquiry with the U. S.

2    Attorney's Office at that time.

3        A couple of months later maybe, I'm not even sure, maybe

4    just a month later, I got a call from Mr. Roeher.  Mr. Roeher and

5    I have been friends for 15 years and he and Mr. Porter have been

6    very good friends over the years, off and on very good, but their

7    businesses -- when he called me and said that the federal folks

8    had come to visit him and could I represent him, and I said, "I

9    have to check.  I represent Mr. Porter."  He said, "Well, I know

10    Alvis very well."

11        I said, "Does your-all's businesses, with particular, Arch

12    Coal overlap?  You don't have any -- you know, do you know

13    anything on him?  Would he know anything about your business,"

14    and basically, he says, "No.  I hear things from time to time, he

15    hears things, but we don't have similar interests at all,"

16    because Mr. Roeher is involved in the repair of mining equipment;

17    whereas, Mr. Porter's business was excavation, and they were

18    basically completely separate.

19        And so, I immediately called Mr. Porter, asked him if there

20    was any problem, if he foresaw any problem.  I did the same with

21    Mr. Roeher.  It turns out -- and then I called Thomas Ryan at the

22    time, asked him if he thought there was any conflict, and I said

23    that, you know, basically, they were both prepared to cooperate

24    and so they already knew, I think, that Mr. Porter was, but they

25    knew that Mr. Roeher wanted to.

1    Turns out, Mr. Roeher's partner is Steve Herndon, and Mr.

2    Herndon and Mr. Roeher had talked about coming and cooperating

3    before the Feds ever showed up and Mr. Herndon was adamant about

4    wanting to cooperate, wanting me to represent him.  I said, "Boy,

5    this is really getting crazy.  Let me check with Mr. Ryan."

6    And what proceeded was, I went back to Mr. Porter, talked to

7    him, same situation.  They were in the same kind of business.

8    They knew each other, but didn't have any business relationship

9    that I saw any overlap and, particularly with everyone

10   cooperating, I didn't see a problem.

11   We actually met on March the 23rd in my office with several

12   folks from the federal government for hours and we were there --

13   I think I was there for 12 hours with Mr. Herndon and with Mr.

14   Roeher, with the okay of Mr. Potter, that he thought there would

15   be no conflict.  Mr. Ryan thought that there would be no

16   conflict.  So that was it, and I thought I was done.  I'd

17   actually turned down a couple of others that just -- it was

18   getting crazy.

19   The next day, they were approaching Steve Herndon's other

20   partner on another business, Mr. Scott Ellis, and they asked us

21   not to speak to Scott Ellis, and we didn't.  Mr. Ellis came in --

22           THE COURT:  Who asked you not to speak to Scott Ellis?

23           MR. DIPIERO:  He'd said -- Mr. Ryan, and said, "Don't

24   talk" -- told Mr. Herndon and us not to talk to Mr. Ellis because

25   they wanted to make sure he just came in and told the truth on

his own and that's what happened.  He came up and spoke with them and, actually, I got a call, I believe, from Mr. Ryan, I could be wrong, but I think it was, saying he's going to need an attorney and, you know, I said, "Well, you know, I've already got these guys," but he said, "Well, he told the exact same story.  With him not knowing what we were going to ask and what had been said, he just told the truth."

And then, so I said, "If you guys are okay, and if my other clients are okay, then I'll check it out," and so I proceeded to call Mr. Porter, and I called Mr. Roeher, and I called Mr. Herndon, and I spoke to each of them, and this is the way it developed and it was just kind of like he was over in the federal building.  He needed -- they wanted him to have an attorney immediately and I said, "Well," I said, "I'll probably save him a lot of money because I was able to not charge everybody the same I might in a normal situation," which is kind of crazy the way this went down, but in truth, I was trying to be very careful.

I went back, because someone suggested to me that in my waiver, I didn't have listed that in the event that something occurs that we don't even expect, whereby, we're at a sentencing hearing or something where one witness is -- one client is called as a witness against another client, that could knock us both out.  I mean, I could be knocked out of both persons and, even under that circumstance, and with the -- knowing that all of them were cooperating, they still wanted to just -- wanted me to

1   represent them.

2      In each instance, I asked Thomas, Mr. Ryan, do you see --

3   can you perceive of anything that's going to come up and, really,

4   nothing has come up.  The guys who worked together just know the

5   same things and they told the same things without -- really,

6   without being in any way checked.  It's just come that they --

7   they remember pretty much the same things.  Each of them have

8   different information, of course, about certain experiences that

9   they have had, but there's nothing that has come up to where I

10   think I've got a problem, and I don't anticipate a problem the

11   way things have shaken out.

12      And these guys have been -- some of these guys have been

13   friends.  They just want to get this thing over with.  It's been

14   a terrible experience for them.  They're telling the truth.

15      I will state, Judge, this is the first time I've ever been

16   in this situation, but each step of the way, I checked with each

17   client and I checked with Mr. Ryan and I got waivers and I'm glad

18   to tender those to you at this time.  I would prefer that they, I

19   don't know, just not be placed on the record or put in the

20   record, but sealed, if they are.

21      THE COURT:  Well, I think we're going to have to put

22   them in the record.

23      MR. DIPIERO:  Okay.

24      THE COURT:  But --

25      MR. DIPIERO:  That's fine.

1      THE COURT:  For the time -- well, I assume they're

2   identical.

3      MR. DEPIERO:  Well, they're not identical, but they're

4   pretty close.  I've changed a couple of them.

5      THE COURT:  You can go ahead and tender all four of

6   them, if you want.

7      MR. DIPIERO:  Actually, Mr. Herndon and Mr. Roeher, I

8   did together.  So -- Judge, there were earlier versions, but some

9   of these were signed recently because I changed a little bit.

10     THE COURT:  Do you have a copy of this?

11     MR. DIPIERO:  Yes.

12     THE COURT:  Okay.  So let me just make sure I'm clear

13  on the nature of the relationships.  Mr. Porter,  Mr. Roeher, and

14  Mr. Herndon know each other, friendly, but Mr. Porter's business

15  is entirely separate from Mr. Roeher and Mr. Herndon?

16     MR. DIPIERO:  Your Honor, Logan is a small town.  They

17  all know each other and have been friendly to some degree.  Mr.

18  Ellis -- Mr. Porter has known Mr. Roeher closely over the years,

19  but there's -- their business interests are completely separate.

20   Now Mr. Roeher and Mr. Herndon were business partners.

21     THE COURT:  Well, yes.  Let me just spin out my

22  understanding of it.

23     MR. DIPIERO:  Okay, sure.

24     THE COURT:  And you can tell me if I've got it right.

25     MR. DIPIERO:  Okay.

1    THE COURT:  Roeher and Herndon are business partners?

2    MR. DIPIERO:  Yes.

3    THE COURT:  So they work together, their financial

4  interests are intertwined?

5    MR. DIPIERO:  Yes, sir.

6    THE COURT:  And then Herndon and Ellis --

7    MR. DIPIERO:  Ellis.

8    THE COURT:  -- are business partners in a separate

9  business venture?

10    MR. DIPIERO:  Exactly.

11    THE COURT:  That Roeher is not involved in?

12    MR. DIPIERO:  Exactly.

13    THE COURT:  And what kind of business is that?

14     (Counsel & defendant confer)

15    MR. DIPIERO:  Mr. Ellis and Mr. Herndon are in a

16  machine shop and Mr. Roeher and Mr. Herndon are in a pump repair

17  shop.  One is a machine shop and one is strictly pumps,

18  specialized.

19    THE COURT:  So that's different than the business

20  that's at issue in this information?

21    MR. DIPIERO:  Yes.  Yes.

22    THE COURT:  I understood that to be electrical

23  equipment.

24    MR. DIPIERO:  Yes.  Yes.  He's got -- he's got three

25  jobs, actually.  This was a separate company than we're talking

1     about here, yes.

2            THE COURT:  And these are all vendor companies of one

3     kind or another?

4            MR. DIPIERO:  That's correct.

5            THE COURT:  To this -- to Mountain -- or whatever the

6     -- Arch Coal?

7            MR. DIPIERO:  Arch Coal, yes.

8            THE COURT:  Right.

9            MR. DIPIERO:  Yes.  They're repair businesses; whereas

10    -- or a supply business.  In one case, it's a supply business for

11    wood and, of course, as I said earlier, Mr. Porter's case, it's

12    heavy equipment, excavation.  It's completely different.

13           THE COURT:  Well, I -- I certainly see that there is

14    some separation between Mr. Porter and the others, but Mr.

15    Herndon, Mr. Roeher and Mr. Ellis are pretty closely related --

16           MR. DIPIERO:  They are, Your Honor.

17           THE COURT:  -- in business.  Isn't there the potential

18    that, at sentencing, something could come up where the government

19    could need one of them to testify against the other?

20           MR. DIPIERO:  There's the potential, there's any

21    potential, but the likelihood of that is close to nil, Your

22    Honor, from what my experience has been thus far with respect to

23    the cooperation that's been ongoing.

24           THE COURT:  Well, I'm at a complete disadvantage here

25    because I know -- compared to what you all know about this case,

1    I know very little.

2           MR. DIPIERO:  Sure.

3           THE COURT:  So I'm not in a great position to assess

4    this.  I look at this as a mine field, frankly, but you might be

5    able to transverse it, nonetheless.

6      Let me hear from the government and see what they have to

7    say about all of this.

8           MS. THOMAS:  The United States is in agreement with

9    everything Mr. DiPiero has said regarding the relationships of

10    the businesses.  I was not privy, of course, to the conversations

11    he has had with his clients.

12      As to the waivers and so forth, I haven't taken a look at

13    the waivers.  However --

14           THE COURT:  Would you like to?

15           MS. THOMAS:  But I can say, at this point in time, we

16    have no indication that there will be an issue at sentencing.  I

17    understand that the Court has hesitation because many things can

18    happen between this plea hearing and sentencing.  However, at

19    this time, we have seen comprehensive cooperation amongst all

20    four defendants and don't foresee, at this time, any issue that

21    could arise between now and sentencing.

22           THE COURT:  Well, I had the same record -- I had the

23    same representations being made to me by both sides the last time

24    I had this come up and it blew up in our faces.

25      So, Mr. DiPiero, I'm going to have to make these a part of

1    the record.

2                MR. DIPIERO:  That's fine.

3                THE COURT:  Because this just has to be in the record.

4                MR. DIPIERO:  That's fine, Your Honor.

5                THE COURT:  Why would I seal these?

6                MR. DIPIERO:  You don't need to, Your Honor.  That's

7    okay.

8                THE COURT:  All right.  Well, I'm going to go ahead --

9    I'm going to -- I'll be inquiring along these same lines.  It

10   might not take as much time because I've now probably heard just

11   about everything I'm going to hear, but I'm going to be making

12   inquiries at all four plea hearings.  So I'll go ahead and make

13   these a part of the record for this hearing and we'll do it, as

14   well, for the other hearings, as well.

15       I'm going to ask a few more questions about this just to

16   complete the record.

17       Mr. Roeher, have you been listening to this conversation and

18   heard everything that your attorney just said?

19                THE DEFENDANT:  Yes, Your Honor.

20                THE COURT:  And did you discuss these matters with your

21   attorney prior to this hearing?

22                THE DEFENDANT:  Yes, Your Honor.

23                THE COURT:  Do you understand that there is some danger

24   in having your lawyer represent someone else who, in a case as

25   closely related to yours, in that your attorney's loyalty should

1    be exclusively to you, and that for reasons we might not even

2    foresee today, that his loyalty to his other clients might become

3    -- we might encounter a conflict between his loyalty to his other

4    clients and his loyalty to you?  Do you understand that?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  Has your attorney explained that and this

7    whole issue to you?

8              THE DEFENDANT:  Yes, sir, he has.

9              THE COURT:  Did he answer any questions that you had

10   about it?

11             THE DEFENDANT:  Yes.  Yes, sir, he has.

12             THE COURT:  All right.  And, notwithstanding our

13   conversation today, do you still want Mr. DiPiero to continue to

14   represent you in this case?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  Do you understand that if you don't want

17   Mr. DiPiero to represent you, the Court will continue this matter

18   and allow you to get another attorney?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  And, if the Court were to find that you

21   were indigent, in other words, unable to afford an attorney, an

22   attorney would be appointed for you?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  And, knowing that, do you still want to

25   proceed with Mr. DiPiero?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And is this your signature that appears on

3    this Waiver of Conflict of Interest Form?

4          THE DEFENDANT:  Yes, Your Honor, it is.

5          THE COURT:  All right.  And you've read the form,

6    including the handwritten portion of it?

7          THE DEFENDANT:  Yes, Your Honor, I have.

8          THE COURT:  Actually, your signature appears on it

9    twice, doesn't it?

10          THE DEFENDANT:  Yes.  Yes, Your Honor, it does.

11          THE COURT:  And did Mr. DiPiero go over this form with

12    you in detail?

13          THE DEFENDANT:  Yes, Your Honor, he did.

14          THE COURT:  Did he answer any questions that you had

15    about the form?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Did you understand all of the matters

18    contained in the form?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  All right.  Any further inquiry either side

21    believes that I should make regarding this matter?

22          MS. THOMAS:  No, Your Honor.

23          MR. DIPIERO:  No, Your Honor.

24          THE COURT:  All right.  I'll go ahead, as I indicated,

25    and have the forms filed, and we'll go ahead and proceed and,

1  hopefully, this will work out.  I -- again, I've only had this

2  happen once before.  It didn't work out in that case, but part of

3  the reason I'm going to go forward is because I know Mr. DiPiero

4  to be a thoughtful, careful and experienced lawyer, and so -- and

5  I have no doubt that he has sized this situation up in every

6  direction that he can think of and it appears to have worked out

7  in spite of the fact that, representing four different

8  defendants, three of which are all in business together, seems to

9  me to be a perilous situation from a conflict standpoint, but

10  we'll go ahead move forward with the plea hearing today.

11      All right.  Mr. Roeher, let me begin by asking you, how old

12  are you, sir?

13              THE DEFENDANT:  52.

14              THE COURT:  And can you briefly describe your

15  educational background?

16              THE DEFENDANT:  I'm a high school graduate.

17              THE COURT:  And can you read and write and understand

18  the English language?

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  Can you briefly describe your work

21  experience?

22              THE DEFENDANT:  I've been a route salesman for 30 --

23  over 30 years to the coal mines.

24              THE COURT:  Have you taken any medicine or drugs or

25  consumed any alcoholic beverages in the last 24 hours?

1           THE DEFENDANT:  Yes, Your Honor.  I have a list of the

2   medications I take.

3           THE COURT:  All right.  I'm going to need to know what

4   those are.  Do you want to just show me the list?

5       Mr. DiPiero, do you want to just tender the list to me?

6           MR. DIPIERO:  Yes, Your Honor.

7           THE COURT:  All right.  Let's go through them one by

8   one.  I'm going to want to know if you have taken them in the

9   last -- have you taken all of these in the last 24 hours?

10          THE DEFENDANT:  Yes, Your Honor, I have.

11          THE COURT:  Either last evening or this morning?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  I'm going to go through each one of them

14   and ask you what they're for.

15      Wellbutrin?

16          THE DEFENDANT:  It's for bipolar disorder.

17          THE COURT:  All right.  Lamictal?

18          THE DEFENDANT:  For the same.

19          THE COURT:  All right.  Carbatrol?

20          THE DEFENDANT:  For the same.

21          THE COURT:  Xanax?

22          THE DEFENDANT:  It's for a -- it's for the same.

23          THE COURT:  All right.  Fenofibrate?  I may not be

24   pronouncing that right.

25          THE DEFENDANT:  Yes.  It's something to do with blood

```
 1    pressure and that type of thing.
 2              THE COURT:  Zocor?
 3              THE DEFENDANT:  That's just a cholesterol medicine.
 4              THE COURT:  All right.  Aspirin is not a prescription
 5    medication.  And Ambien is a sleep aid, correct?
 6              THE DEFENDANT:  Yes, Your Honor.
 7              THE COURT:  All right.  To the best of your -- and did
 8    you -- you took the Ambien last night?
 9              THE DEFENDANT:  Yes, Your Honor.
10              THE COURT:  About what time?
11              THE DEFENDANT:  10:00.
12              THE COURT:  All right.  To the best of your knowledge,
13    as you sit here today, are you suffering from any side effects
14    from any of those medications that would in any which affect your
15    ability to fully participate in this hearing today?
16              THE DEFENDANT:  No, Your Honor.
17              THE COURT:  All right.  Have you ever been treated for
18    any mental illness or addiction to drugs of any kind?
19              THE DEFENDANT:  Yes, Your Honor.
20              THE COURT:  And have you been -- can you give me a
21    little bit of detail about that?
22              THE DEFENDANT:  It was in 2003, I think, was when it
23    started.  I attended a rehabilitation in Florida, 30-day rehab
24    program, and I've been clean since 2004.
25              THE COURT:  And what was that for?
```

1    THE DEFENDANT:  Cocaine.

2    THE COURT:  All right.  Any other mental health or drug

3    treatment?

4    THE DEFENDANT:  No, sir.

5    THE COURT:  Some of the medications that you described,

6    that you indicated you were taking, are -- appear to be mental

7    health-related.  Are those prescribed by your family physician?

8    THE DEFENDANT:  No.  They're prescribed by a

9    psychiatrist that I do still see.

10    THE COURT:  Okay, and how long have you been seeing a

11    psychiatrist?

12    THE DEFENDANT:  For probably seven or eight years.

13    THE COURT:  Okay.  Have you had any inpatient

14    treatment?

15    THE DEFENDANT:  No, sir.  No.

16    THE COURT:  All right.  And you indicated that you had

17    a -- well, you indicated that the medications were for bipolar

18    disorder.  Do you have any other -- did the psychiatrist diagnose

19    you with that?

20    THE DEFENDANT:  Yes, sir.

21    THE COURT:  Have you had any other psychological or

22    psychiatric diagnoses?

23    THE DEFENDANT:  No, sir.

24    THE COURT:  All right.  Do you know where you are and

25    why you are here today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And do you have any hearing impairment or other disability which would prevent you from fully participating in this hearing today?

THE DEFENDANT:  No, Your Honor.

THE COURT:  And, Mr. DiPiero, do you have any reason to question the competence of your client?

MR. DIPIERO:  None, Your Honor.  None at all, Your Honor.

THE COURT:  All right.  I have received the original of the plea agreement.

Mr. Roeher, is that your signature on the tenth and final page of the plea agreement?

THE DEFENDANT:  Yes, sir.

THE COURT:  And are those your initials that appear on the other pages of the plea agreement?

THE DEFENDANT:  Yes, they are, Your Honor.

THE COURT:  Now, there's a handwritten change in Paragraph 35(a), which is on the first page and, on Paragraph 3(c), which is on the top of Page 2 where the maximum penalties were changed by handwritten notation, are those your initials that appear next to those two changes?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And you agree with those two changes?

THE DEFENDANT:  I do, yes.

1          THE COURT:  And have you read and reviewed with your

2   attorney each of the 20 paragraphs of the plea agreement and the

3   two exhibits attached to it?

4          THE DEFENDANT:  Yes, Your Honor, I have.

5          THE COURT:  And do you wish to have the various terms

6   of the plea agreement orally stated on the record or do you

7   believe that that is unnecessary?

8          THE DEFENDANT:  I believe that is unnecessary.

9          THE COURT:  All right.  And do you understand and agree

10  with all of the terms and provisions contained in the plea

11  agreement?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Mr. DiPiero, have you reviewed each of the

14  20 paragraphs of the plea agreement and its exhibits with your

15  client?

16         MR. DIPIERO:  I have, Your Honor.

17         THE COURT:  And, Mr. DiPiero and Ms. Thomas, is there

18  any reason why either of you believe that the various terms of

19  the plea agreement should be orally stated on the record?

20         MS. THOMAS:  No, Your Honor.

21         MR. DIPIERO:  I don't think so, Your Honor.

22         THE COURT:  All right.  Nonetheless, Mr. Roeher, there

23  are several provisions of the plea agreement I want to discuss

24  with you, starting with the section entitled "Restitution," which

25  begins on Page 2 and runs over onto Page 3.

1    Now that section recites that you agree that you owe

2 restitution to the IRS in the amount of $22,098.89 and that you

3 agree to pay that with interest.  Do you understand that?

4         THE DEFENDANT:  Yes, Your Honor.

5         THE COURT:  And, in connection with that, in Section

6 5(e) of the plea agreement, there is an appeal waiver with regard

7 to that, and let me just first ask you if you understand that a

8 "waiver" is a legal term that means you are giving something up?

9 Do you understand that?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  All right.  So, in Section 5(e), do you

12 understand that you agree to waive your right to appeal any order

13 imposing restitution unless the amount of restitution imposed is

14 greater than the amount that's recited at the top of Section 5?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Do you understand that?  All right.

17         MR. DIPIERO:  Your Honor, for the record, I believe he

18 paid that this week.

19         THE COURT:  All right.  Very well.  Do you have a

20 receipt you want to put into the record?

21         MR. DIPIERO:  I don't have that at this point, no, Your

22 Honor.

23         THE COURT:  All right.  We can deal with that at

24 sentencing.

25         MR. DIPIERO:  Okay.

1        THE COURT:  I appreciate that information.

2    And do you understand that a restitution -- Mr. Roeher, that

3    a restitution order will be used by the IRS as the basis for a

4    civil assessment?

5        THE DEFENDANT:  Yes.

6        THE COURT:  And that's set forth in -- for the record,

7    in Section 6 of the plea agreement, which is on Page 3.

8    Pardon me just a second.

9    (Pause)

10   All right.  Next, I want to talk with you regarding Section

11   7, which begins on Page 3 and runs through Page 4, and over to

12   Page 5.  It's entitled "Forfeiture".

13   Now, you agree in this section, and specifically Section

14   7(c), to pay to the IRS an amount in forfeiture, which means the

15   government takes certain property, and this is separate from

16   restitution.  You agree to pay $35,170.60.  Do you understand

17   that?

18       THE DEFENDANT:  Yes, Your Honor.  I've already paid

19   that.

20       THE COURT:  All right.  And do you understand that in

21   subsection (g) of Section 7, which is at the top of Page 5, that

22   you waive any defenses to any forfeiture action related to this

23   matter?  Do you understand that?

24       THE DEFENDANT:  Yes, sir.

25       THE COURT:  All right.  All right.  Next, I want to

refer you to Section 13 of the plea agreement, which begins on
Page 6 and runs over onto Page 7, and that section is entitled
"Stipulation of Facts and Wavier of Federal Rules of Evidence
410".

    Now this section relates to a couple of different matters,
the first of which is the Stipulation of Facts, which is attached
to the plea agreement as Exhibit B, and I want to turn your
attention to that document now.  That is a three-page document
and, on the third page, is that your signature which appears
there?

            THE DEFENDANT:  Yes, Your Honor, it is.

            THE COURT:  And have you read the Stipulation of Facts?

            THE DEFENDANT:  Yes, sir, I have.

            THE COURT:  And do you agree that all of the facts
contained in the stipulation are true?

            THE DEFENDANT:  Yes, Your Honor.

            THE COURT:  All right.  A little bit about what will be
happening from here on out.  I will be asking the probation
officer to prepare a Presentence Investigation Report.  That
report will contain detailed recommended factual findings
regarding this offense and your background, among other things.

    Ultimately, at sentencing, I will make factual findings
regarding -- based at least in part on the recommendations
contained in the Presentence Report.

    Now you and the government have reached an agreement

1    regarding certain facts contained in this stipulation, but I want

2    you to understand that in this process, neither the probation

3    officer, nor this Court, are bound by that Stipulation of Facts.

4    Do you understand that?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  And do you further understand that if I

7    make findings of fact at sentencing that are different from of

8    inconsistent with the facts contained in the stipulation, you

9    will still be bound by your guilty plea and would have no right

10   to withdraw it?  Do you understand that?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  All right.  The other matter addressed in

13   Section 13 is a waiver of Federal Rule of Evidence 410.  Now Rule

14   410 generally provides that information or documents regarding

15   plea negotiations, and this stipulation of fact would fall into

16   that category, is generally not admissible at trial.  In other

17   words, the government can't use that sort of thing against you at

18   trial.

19       However, under this agreement, if you withdraw from the plea

20   agreement or it's no longer any good as a result of your

21   violation of one or more of its terms and there is a subsequent

22   trial, then under this waiver, the government would be allowed to

23   present the Stipulation of Facts in its chief or for other

24   purposes at that trial.  Do you understand that waiver?

25           THE DEFENDANT:   Yes, Your Honor.

1          THE COURT:  All right.  Next, I want to refer you to

2     Section 14 of the plea agreement, which is entitled -- it's on

3     Page 7.  It's entitled "Agreement on Sentencing Guidelines".

4          Now, before we get into that, I want to talk with you a

5     little bit about the federal sentencing guidelines and, first, I

6     want to ask you, has your attorney talked with you about the

7     federal sentencing guidelines and how they generally work?

8          THE DEFENDANT:  Yes, sir, he has.

9          THE COURT:  And did he show you that chart in the back

10    of the guidelines book?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Well, working from that chart, I want to

13    have a similar discussion with you.  If you'll recall from the

14    chart, on the left side of the chart, there's a series of numbers

15    that run down the page from low to high, and those are offense

16    levels, and the offense level is calculated by starting with a

17    Base Offense Level, which is a starting point, and then the

18    offense level can be adjusted upward or downward from there based

19    on the facts and circumstances in the case to arrive at an

20    adjusted offense level, and then consideration is generally given

21    to a reduction for acceptance of responsibility.  Has your

22    attorney talked with you about that?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  All right.  And then you generally arrive

25    at a Total Offense Level.  Then you go up to the top of the chart

and there are six different criminal history categories and you would fall into one of those, depending on the number, if any, of points assigned to any prior convictions that you may have.

Then you combine the criminal history category with the Total Offense Level and arrive at a point in the chart that gives a range of months of imprisonment. Certain parts of the chart allow for certain alternatives to imprisonment. Do you understand all of this so far?

THE DEFENDANT: Yes, sir

THE COURT: Has your attorney explained all of this to you so far?

THE DEFENDANT: Absolutely. Yes, sir.

THE COURT: All right. Once we arrive at that range of months -- and I have the authority to sentence you within that range. I would also have the authority to sentence you outside of that range, either above it or below it. If I do that based on factors identified in the guidelines themselves, that's generally known as a departure. If I do that based on factors outside of the guidelines, that's generally known as a variance; in other words, sentencing you outside -- above or below the guideline range.

Do you understand all of these things I've told you about the guidelines?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And has your attorney gone over all of them

1    with you?

2         THE DEFENDANT:  Yes, sir.

3         THE COURT:  All right.  Well, with of that in mind

4    then, in Section 14, there is an agreement that you've reached

5    with the government regarding one or more provisions of the

6    federal sentencing guidelines.  This is similar to the

7    Stipulation of Facts in that the probation officer, in the

8    Presentence Report, will include a recommended guideline

9    calculation and, ultimately at sentencing, I will make guideline

10   findings based at least in part on that recommendation.

11       However, I want you to understand that even though you have

12   reached an agreement with the government on the guidelines

13   contained in Section 14 of the plea agreement, neither the

14   probation officer, nor this Court, are bound by that agreement on

15   the guidelines.  Do you understand that?

16        THE DEFENDANT:  Yes, sir.

17        THE COURT:  And do you understand that if I make

18   guideline findings at sentencing that are different from or

19   inconsistent with this agreement on the guidelines, you will

20   still be bound by your guilty plea and would have no right to

21   withdraw it?  Do you understand that?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  All right.  Next, I want to refer you to

24   Section 15 of the plea agreement, which is entitled "Waiver of

25   Appeal and Collateral Attack".  Now this section relates to a

1    couple of different procedures that I want to go over with you

2    briefly.

3        An "appeal" is a procedure by which party to case before a

4    District Court like this one and, in a criminal case, it is often

5    the defendant, goes to the Court of Appeals, which is the next

6    level up of the court system, and argues that certain errors or

7    mistakes may have taken place in their criminal case before the

8    District Court.

9        And a collateral attack, which is sometimes referred to as a

10   "habeas corpus petition", is a separate civil case that a

11   defendant may file after their criminal case is over, in which

12   they may also argue that certain errors or mistakes may have

13   taken place in their criminal case before the District Court.

14       Now, do you understand those two procedures, at least as

15   I've briefly described them to you?

16               THE DEFENDANT:  Yes, sir.

17               THE COURT:  All right.  One of the things, before we

18   get into this, is I want to talk with you about the two phases of

19   a criminal case.

20       The first phase of a criminal case is the -- is the portion

21   of the case where guilt or innocence is determined.  Sometimes

22   that's by a trial, much more often, it's by a guilty plea like

23   what we're doing today.  That phase of the case includes the very

24   beginning of the case up to the point of a plea hearing in this

25   case.

1    The second phase of the case then is the penalty phase where

2    the penalty for the crime is determined, and that concludes with

3    the sentencing hearing at the end of the case.

4    Now do you understand the two phases of a criminal case as

5    I've described them?

6            THE DEFENDANT:  Yes, sir.

7            THE COURT:  All right.  With all of that in mind then,

8    Section -- the first paragraph of Section 15 contains an appeal

9    wear and I want to go over that with you now.

10    Do you understand that you have the right to appeal your

11    conviction and any sentence of imprisonment, fine or term of

12    supervised release, or the manner in which the sentence was

13    determined on any ground whatsoever, with one exception, you may

14    appeal any sentence that is greater than the maximum penalty set

15    forth by statute?  Do you understand that waiver?

16            THE DEFENDANT:  Yes, Your Honor.

17            THE COURT:  Anything about it that you don't understand

18    or that you have questions about?

19            THE DEFENDANT:  No, Your Honor.

20            THE COURT:  All right.  Now, in the second paragraph of

21    Section 15, do you also understand that you may not file a later

22    civil proceeding, sometimes referred to as a "collateral attack"

23    or a "habeas corpus petition", challenging your plea, conviction

24    or sentence?

25            THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And, finally, do you understand that you

2     are in no event waiving your right to claim ineffective

3     assistance of counsel either on appeal or by collateral attack?

4          THE DEFENDANT:  Yes, sir, Your Honor.

5          THE COURT:  All right.  Finally, I want to refer you to

6     Section 16 of the plea agreement, which appears on Page 8, and is

7     entitled "Waiver of FOIA and Privacy Right".

8        Now this waiver means you can't go back and seek documents

9     or other information about this case from the government even

10    with a Freedom of Information Act request.  Do you understand

11    that waiver?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Mr. DiPiero, have you thoroughly reviewed

14    the plea agreement with your client?

15         MR. DIPIERO:  More than once, Your Honor.

16         THE COURT:  And do you believe that he fully

17    understands the various terms and provisions of the plea

18    agreement, including the waivers and other matters that I have

19    gone over with him this morning?

20         MR. DIPIERO:  Yes, Your Honor.

21         THE COURT:  And, Mr. Roeher, have you reviewed the plea

22    agreement in detail with your attorney?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  And do you believe that you have had

25    adequate time to discuss your case fully with your attorney?

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  Has your attorney answered any questions

3     that you have had about your case?

4              THE DEFENDANT:  Yes, sir, Your Honor.

5              THE COURT:  And, Mr. DiPiero, during your

6     representation of the defendant, has he been cooperative?

7              MR. DIPIERO:  Yes, Your Honor.

8              THE COURT:  All right.  And, Mr. Roeher, has anything

9     further been agreed to, either orally or in writing, that is not

10    contained in the plea agreement?

11             THE DEFENDANT:  No, Your Honor, not that I'm aware of.

12             THE COURT:  All right.  I will order that the plea

13    agreement be filed.

14        I will find that the defendant understands and agrees with

15    the terms contained in the plea agreement.

16        I will defer accepting or accepting the plea agreement until

17    sentencing, after the Presentence Report has been received and

18    considered.

19        Now, Mr. Roeher, have you received and read and reviewed

20    with your attorney the information, proposed information, or

21    charging document in this case?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  And do you understand the charge contained

24    in the information?

25             THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Would you like me to read the information to you or will you waive the reading of the information?

THE DEFENDANT:  I will waive it.

THE COURT:  All right.  As I understand it, you will be pleading guilty to a single-count information which charges you with filing a false tax return in violation of 26 U. S. C. Section 7206(1).  Now I want to go over that charge and that statute with you in just a little bit more detail.

Section 7206(1) provides in pertinent part that:

"Any person who willfully makes and subscribes any return, statement, or other document, which contained or is -- which contains or is verified by a written declaration that is made under the penalties of perjury, and which does not -- and which he does not believe to be true and correct as to every material matter shall be guilty of a crime against the United States."

Now, in order to prove that charge against you, the government would have to prove the following elements of that crime, each beyond a reasonable doubt, and they are:

First, that you made and subscribed and filed a tax return containing a written declaration;

Second, that the tax return was made under penalties of perjury;

Third, that you knew the return was not true and correct as to every material matter;

And, finally, that you acted willfully.

1    Now, I want to share with you some definitions that apply to

2  what I have just told you.

3    To "subscribe" means to sign one's name on a document.

4    A "material matter" is any statement that has a natural

5  tendency to influence or impede the IRS in determining the

6  correctness of a tax return and, in all cases, a correct amount

7  of income is clearly a material matter.

8    The "test of materiality" is whether a particular item must

9  be reported in order that the taxpayer estimate and compute his

10  tax correctly.

11    To "act willfully" means to act voluntarily and deliberately

12  and with the intention to violate a known legal duty.

13    "Willfulness" requires the government to prove that the law

14  imposed a duty on defendant, that the defendant knew of this

15  duty, and that he voluntarily and intentionally violated the law.

16    Is there any objection to the elements of the offense as I

17  have described them?

18    MS. THOMAS:  No, Your Honor.

19    MR. DIPIERO:  No, Your Honor.

20    THE COURT:  All right.  Very well.

21    Now, Mr. Roeher, I want to go over with you the maximum and

22  any minimum sentences you may face as a result of your guilty

23  plea, and that is a maximum term of imprisonment of three years;

24  a maximum fine of $250,000.00, or twice the gross pecuniary gain

25  or loss resulting from your conduct, whichever is greater; and a

maximum term of supervised release of one year.

A mandatory special assessment of $100.00 would be required, which your attorney is now holding up a receipt, which I'm assuming indicates you've already paid that, and you may make that -- we'll make that a part of the record. You can tender it after the hearing.

MR. DIPIERO: Yes, sir.

THE COURT: But we will make that a part of the record for this proceeding.

And restitution may be ordered if it is found to be applicable, as it appears to be and, as your attorney indicates, you have already paid, which I appreciate.

Next, I want to return to our discussion of the federal sentencing guidelines. They are advisory, meaning they're not mandatory or don't have to be followed, but they'll nevertheless play an important role in your case.

This Court will consider the factors set forth in 18 U. S. C. Section 3553(a), including the advisory guideline factors in determining the appropriate sentence in your case.

I now want to ask you some questions that will help me to understand your understanding of the guidelines.

Have you discussed with your attorney the various factors which apply in determining what the sentence in your case may be under the advisory guidelines?

THE DEFENDANT: Yes, sir.

1        THE COURT:  And do you understand that on this

2    single-count information, you cannot in any event receive a

3    greater sentence than the statutory maximum that I explained to

4    you a few moments ago?

5        THE DEFENDANT:  Yes, sir, Your Honor.

6        THE COURT:  Do you understand the Court will not

7    determine the sentence for your case until a later date, when a

8    Presentence Report has been completed, and both you and

9    government have had an opportunity to challenge the facts and

10   analysis reported by the probation officer?

11       THE DEFENDANT:  Yes, Your Honor.

12       THE COURT:  Do you also understand that under a concept

13   known as "relevant conduct", this Court, in determining the Total

14   Offense Level for sentencing purposes under the guidelines, may

15   take into account any conduct, circumstances or injuries relevant

16   to the crime of which you may be convicted?

17       THE DEFENDANT:  Yes, sir.

18       THE COURT:  Do you understand that after the Court has

19   determined what advisory guidelines apply to your case, the Court

20   has the authority to vary or depart from the advisory guidelines

21   and impose a sentence that is more severe or less severe than the

22   sentence called for by the guidelines?

23       THE DEFENDANT:  Yes, sir.

24       THE COURT:  Do you understand that in determining your

25   sentence, the Court is obligated to calculate the applicable

1    sentencing guideline range, and to consider that range, possible

2    departures under the guidelines, and other sentencing factors

3    under 18 U. S. C. Section 3553(a)?

4              THE DEFENDANT:  Yes, sir, Your Honor.

5              THE COURT:  Do you understand that parole has been

6    abolished and, if you're sentenced to prison, you will not be

7    released on parole?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Do you understand if the Court accepts your

10   plea of guilty and the sentence ultimately imposed upon you is

11   more severe than you had hoped for or expected, you will still be

12   bound by your guilty plea and would have no right to withdraw it?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  Do you understand if you plead guilty to

15   this single-count information, which charges you with a felony,

16   you may lose important civil rights, such as the right to vote;

17   the right to serve on a jury; and the right to hold -- the right

18   to hold public office; and the right to own or possess a firearm?

19             THE DEFENDANT:  I do, Your Honor.

20             THE COURT:  All right.  Next, Mr. Roeher, I want you to

21   understand that you have the right to have this matter presented

22   to a federal grand jury.  Now, I want to explain that process to

23   you briefly.

24        A grand jury is composed of at least 16 and not more than 23

25   persons, and at least 12 grand jurors must find that there is

probable cause to believe that you committed the crime with which you are charged before you may be indicted.

Now do you see any benefit of having this case presented to a federal grand jury?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Do you see any prejudice or disadvantage to you of not having the case presented to a grand jury?

THE DEFENDANT:  No, Your Honor.

THE COURT:  All right.  Your counsel has been provided with a Waiver of Indictment Form and I want to go over that with you now.  It contains what we call the style of the case, United States of America versus Gary L. Roeher, the criminal action number, it's entitled "Waiver of Indictment", and it states as follows:

"I, Gary L. Roeher, am accused of violating 26 U. S. C. Section 7206(1).  I have been advised of the nature of the charge, of the proposed information, and of my rights.  I hereby waive in open court prosecution by indictment and consent that the proceeding may be by information rather than by indictment."

And there's space for you to sign and date, space for your counsel to sign, and space for me to sign.

Do you understand what I just read to you?

THE DEFENDANT:  Yes, sir.

THE COURT:  Is there anything about the waiver of indictment procedure that you don't understand or that you have

1    questions about?

2              THE DEFENDANT:  No, sir.

3              THE COURT:  If you're prepared to do so then, I will

4    ask you to execute the Waiver of Indictment Form by signing and

5    dating it, then I will ask your counsel to sign it and tender it

6    to the Court.

7         All right.  I would note for the record that the defendant

8    has signed and dated the Waiver of Indictment Form.  It has been

9    endorsed by his counsel.  I am now signing it, and I will order

10   that it be made a part of the record for this proceeding.

11        Mr. Roeher, I next want to talk with you regarding your

12   trial and constitutional rights.

13        You have the right to plead not guilty and maintain a not

14   guilty plea throughout these proceedings, including at trial.

15        You have the right to be represented by counsel.

16        You have the right to a speedy and public trial by a jury

17   composed of citizens of this district.

18        You have the right to confront and have your attorney cross

19   examine witnesses and have your attorney move to suppress any

20   evidence he believes was illegally or unconstitutionally

21   obtained.

22        You have the right not to testify or otherwise incriminate

23   yourself and your exercise of this right cannot be held against

24   you.

25        Do you understand these rights so far?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  You have the right to have the government

3     come in here and prove its case beyond a reasonable doubt.

4          The jury's verdict would have to be unanimous.

5          You have the right to present evidence on your own behalf.

6          You have the right to testify at trial on your own behalf.

7          And you have the right to subpoena witnesses to testify for

8     you.

9          Do you understand all of these rights?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Any of them that you don't understand or

12     that you have questions about?

13          THE DEFENDANT:  No, sir.

14          THE COURT:  And, other than your right to counsel, do

15     you understand that you will be giving up these rights by

16     entering a plea of guilty?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Do you understand that once you have

19     entered a plea of guilty, there is not going to be any trial, no

20     jury verdict, and no findings of innocence or guilt based upon

21     disputed evidence presented to me or to a jury?

22          THE DEFENDANT:  Yes, Your Honor, I understand.

23          THE COURT:  And do you believe that you fully

24     understand the consequences of entering a plea of guilty?

25          THE DEFENDANT:  Yes, Your Honor.

```
 1              THE COURT:  And, Mr. DiPiero, having reviewed this case
 2    and the plea agreement in detail with your client, do you believe
 3    that he fully understands his rights and fully understands the
 4    consequences of entering a plea of guilty?
 5              MR. DIPIERO:  Yes, Your Honor.
 6              THE COURT:  All right.  I note that there is a
 7    Stipulation of Fact.  Does the -- it appears to address the
 8    elements of the offense.  Does counsel have any objection to the
 9    Court utilizing the stipulation as the factual -- or in its
10    consideration of the factual basis for the plea?
11              MS. THOMAS:  No, Your Honor.
12              MR. DIPIERO:  No, Your Honor.
13              THE COURT:  All right.  I will nonetheless defer a
14    factual basis finding until sentencing, but will proceed with the
15    guilty plea.
16        Mr. Roeher, will you please stand?
17        As to the charge contained in the single-count information,
18    how do you plead, sir, guilty or not guilty?
19              THE DEFENDANT:  Guilty, sir.
20              THE COURT:  You may be seated.
21        Your counsel has been provided with a written Plea of Guilty
22    Form.  I would ask that you go over that with him, if necessary,
23    sign and date it.  Then, I will ask him to sign it and tender it
24    to the Court.
25        All right.  I'll note for the record that the defendant has
```

1    signed and dated the written Plea of Guilty Form.  It has been

2    witnessed by his counsel and I will order that it be made a part

3    of the recording for this proceeding.

4         Mr. Roeher, is this plea the result of any threat or

5    coercion or harassment of you by anyone?

6              THE DEFENDANT:  No, Your Honor.

7              THE COURT:  Is it the result of any promise or

8    inducement other than those contained in the plea agreement?

9              THE DEFENDANT:  No, Your Honor.

10             THE COURT:  Are you pleading guilty to protect anyone?

11             THE DEFENDANT:  No, Your Honor.

12             THE COURT:  All right.  Are you acting voluntarily and

13   of your own free will in entering this guilty plea?

14             THE DEFENDANT:  I am, Your Honor.

15             THE COURT:  Has anyone promised or predicted the exact

16   sentence which will be imposed upon you in this matter?

17             THE DEFENDANT:  No, Your Honor.

18             THE COURT:  Do you understand that no one could know at

19   this time the exact sentence which will be imposed?

20             THE DEFENDANT:  Excuse me?

21             THE COURT:  Do you understand that no one could know at

22   this time the exact sentence which will be imposed?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  Has your attorney adequately represented

25   you in this matter?

1           THE DEFENDANT:  Yes, Your Honor.

2           THE COURT:  Has your attorney left anything undone

3   which you think should have been done?

4           THE DEFENDANT:  No, Your Honor.

5           THE COURT:  Have you or your attorney found any defense

6   to the charge contained in the information?

7           THE DEFENDANT:  Excuse me?

8           THE COURT:  Have you or your attorney found any defense

9   to the charge contained in the information?

10          THE DEFENDANT:  No.

11          THE COURT:  Are you, in fact, guilty of the crime

12  charged in the information?  In other words, did you do it?

13          THE DEFENDANT:  Yes, Your Honor, I did.

14          THE COURT:  I want to clarify one thing.  On this tax

15  return that you filed, you -- you understood that this -- as I

16  understand the stipulation, you claimed -- you claimed this

17  expense as a business expense?

18          THE DEFENDANT:  I did, yes, Your Honor.

19          THE COURT:  And when, in fact, it was a personal

20  expense?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  And you understood at the time that that

23  should not have been claimed as a business expense?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  And you did so anyway?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And, just so I'm clear, you understood that

3     the -- you might not have known the exact tax provision, but the

4     tax law required you to not report that as a business expense?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  All right.  I will find that the defendant

7     is competent and capable of entering an informed plea; that the

8     plea is freely and voluntarily made; that the defendant

9     understands the nature of the charges and is aware of the

10    consequences of the plea.

11         I will find that the defendant understands his rights and

12    understands that he is giving up these rights by entering a plea

13    of guilty.

14         I will defer a factual basis finding, but I will accept the

15    plea of guilty to the information, and will defer adjudging the

16    defendant guilty until the time of sentencing.

17         I will ask the probation officer to prepare a Presentence

18    Investigation Report.

19         Mr. Roeher, it's important to cooperate fully with the

20    probation officer in the preparation of the Presentence Report.

21    If you fail to cooperate fully and truthfully with the probation

22    officer, you could be subject to an enhancement of your sentence

23    or the forfeiture of certain sentence reductions for which you

24    might otherwise be eligible.

25         It is also important that you not commit any crimes between

1    now and sentencing, as there may be additional punishments

2    imposed for committing additional crimes.

3         I will set this matter for sentencing on October 15th, 2014

4    at 2:00 p.m.  I will put other presentence dates in my post-plea

5    order.

6         What's the government's position with regard to bond?

7              MS. THOMAS:  No objection.

8              THE COURT:  All right.  I assume you share that

9    position, Mr. DiPiero?

10             MR. DIPIERO:  Absolutely.

11             THE COURT:  I will allow the defendant to be released

12   today on a ten thousand dollar unsecured bond under the standard

13   conditions and/or those listed in the Pretrial Services Report,

14   and I will go ahead and sign my part of the paperwork right now

15   and, Mr. DiPiero, you and your client can take care of the rest

16   after the conclusion of the hearing.

17             MR. DIPIERO:  May I have one second, Your Honor, with

18   him?

19             THE COURT:  You may.

20        (Counsel confers with defendant)

21             MR. DIPIERO:  Your Honor, Mr. Roeher has been involved

22   with youth basketball for many years and he coaches a team that

23   goes -- I guess they're going once to Tennessee and once to North

24   Carolina.  I was just wondering if he would be able to take his

25   team to these places to coach on these weekends.  These are big

1   things that they build up and -- each year to be able to do.

2              THE COURT:  Is that this summer?

3              MR. DIPIERO:  Yes, sir.

4              THE COURT:  Is there any objection?

5              MS. THOMAS:  No objection.

6              THE COURT:  All right.  Just -- the defendant needs to

7   let the probation officer know in advance the travel plans, when

8   he's going and when he's coming back, et cetera, and as long as

9   the probation officer is fully informed in advance, that

10  shouldn't be a problem.

11             MR. DIPIERO:  Thank you, sir.

12             THE COURT:  All right.  Is there anything else we need

13  to take up in this case?

14             MS. THOMAS:  No, Your Honor.

15             MR. DIPIERO:  No, Your Honor.

16             THE COURT:  All right.  We'll start the next hearing in

17  about five, ten minutes.

18         (Proceedings concluded at 10:18 a.m., July 9, 2014.)

19

20  CERTIFICATION:

21      I, Ayme A. Cochran, Official Court Reporter, certify that

22  the foregoing is a correct transcript from the record of

23  proceedings in the matter of United States of America, Plaintiff

24  v. Gary L. Roeher, Defendant, Criminal Action No. 2:14-cr-00109,

25  as reported on July 9, 2014.

1

2   s/Ayme A. Cochran, RMR, CRR                November 12, 2014

3   Ayme A. Cochran, RMR, CRR                        DATE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25